# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1991V
UNPUBLISHED

| | |
|---|---|
| AMY MCCALLUM,<br><br>　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: November 2, 2022<br><br>Special Processing Unit (SPU);<br>Entitlement to Compensation;<br>Severity Requirement; Shoulder<br>Injury Related to Vaccine<br>Administration (SIRVA) |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA, for Petitioner.*

*Naseem Kourosh, U.S. Department of Justice, Washington, DC, for Respondent.*

**RULING ON ENTITLEMENT**[1]

On December 13, 2019, Amy McCallum filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a meningococcal vaccine administered to her on September 20, 2018. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons detailed herein, I find that Petitioner has satisfied the six-month sequelae requirement, and she has satisfied the other requirements of a compensable Table SIRVA injury. Petitioner is thus entitled to compensation under the Vaccine Act.

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Relevant Procedural History

A year and a half after the claim's initiation, Respondent filed his Rule 4(c) Report challenging compensation. ECF No. 22. While Respondent agreed that Petitioner could met the QAI criteria for a Table SIRVA injury, he maintained that the six-month sequalae requirement could not be satisfied. *Id.* at 6. To resolve the matter expeditiously, briefs addressing the severity requirement and entitlement were ordered.

On December 13, 2021, both parties filed their respective briefs. Petitioner submitted that the treatment gap in her record (between three- and six-months post-vaccination) was not proof of resolution of her alleged SIRVA. ECF No. 30 at 6-7. Rather, the medical records substantiate one continuous SIRVA injury lasting more than six months, with no separate injury or reinjury. *Id.* at 16-19. Respondent maintained that Petitioner's vaccine-related shoulder injury did not persist for six months. ECF No. 29. He further submitted that any lingering pain was the product of her lifting heavy objects at work. *See id.* at 9.

The matter is ripe for adjudication.

## II. Factual Findings and Ruling on Entitlement

At issue is whether Petitioner continued to suffer the residual effects of GBS for more than six months. Section 11(c)(1)(D)(i) (statutory six-month severity requirement).

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that

2

*Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

However, incomplete or inaccurate medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.* It is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational. *Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993).

### B. Analysis

After a review of the entire record, including Respondent's Rule 4 Report and the parties' briefs, I find that Petitioner has satisfied the six-month sequelae requirement and has satisfied the QAI requirements for a Table SIRVA – if only by mere inches.[3] I specifically note the following facts:

- On August 21, 2018, Petitioner presented to a medical treater with abdominal pain. Ex. 3 at 322. An X-ray and CT scan showed a 4cm calcified cyst, as well as smaller cysts, located in the spleen. Ex. 3 at 330, 371.

---

[3] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as arguments presented by both parties.

- On August 27, 2018, Petitioner was referred to a pain clinic for her sacroiliac pain. Ex. 3 at 390. Dr. Yijia Chu assessed Petitioner with sacroiliac joint dysfunction and low back pain. Ex. 3 at 484. Petitioner received a sacroiliac joint injection on September 19, 2018, which provided substantial relief. Ex. 6 at 16, 18.

- On September 14, 2018, Petitioner saw Dr. Joel Green regarding her splenic cysts. He advised a total splenectomy, and Petitioner agreed to the procedure. Ex. 3 at 396.

- On September 20, 2018, Petitioner presented for her pre-operative exam for her splenectomy scheduled for October 9, 2018. Ex. 3 at 488. Petitioner had a normal exam, and at this time received the subject meningococcal vaccine in her left deltoid. Petitioner also received a pneumococcal vaccine in her left deltoid and Hib and Tdap vaccines in her right deltoid. Ex. 2 at 3.

- On September 26, 2018, Petitioner called her primary care office and reported to Nurse Ashley Waldorf that "she had immunizations last week and her left arm is extremely painful." Ex. 3 at 503. Laura Kass, PA-C advised Petitioner to maintain use of the arm, and to apply heat and ice. *Id.*

- On October 5, 2018, Petitioner called her primary care office a second time and reported continued shoulder pain and limited range of motion. She reported that she received vaccines two weeks ago. Ex. 3 at 508. Petitioner's PCP, Dr. Tracy Lixie, advised that Petitioner should be seen if her shoulder pain was worsening. *Id.*

- On October 8, 2018, Petitioner presented to her primary care office for arm pain. She reported to Kaili Walker, PA-C that "she was given a couple vaccines about 2 weeks ago and her arms have been hurting ever since. She said that the vaccines where (sic) given a lot higher than they have been given in the past." Ex. 3 at 513. Petitioner reported that her left shoulder pain was worse than her right shoulder pain, advised that she had pain with movement one day post-vaccination, and described her pain as sharp without numbness, tingling, or weakness. *Id.* at 514. PA-C Walker found "tenderness (full ROM but pain with full flexion and abduction in lateral shoulder) and bony tenderness (lateral head of humerus)." *Id.* at 515. PA-C Walker felt that the pain was likely caused by where the vaccines were injected or involvement of an underlying tendon. *Id.* Petitioner was advised to continue icing and follow-up if her pain did not improve. *Id.*

4

- Petitioner underwent splenectomy with Dr. Green on October 9, 2018 and was discharged the next day. Ex. 3 at 521, 702. Petitioner was advised by phone call of care instructions and oxycodone usage on October 11, 2018. Petitioner reported that she was using her medication appropriately and had no issues obtaining services, medications, or supplies needed. *Id.* at 522.

- Petitioner presented for a splenectomy follow-up on October 26, 2018. Dr. Green noted that Petitioner was recovering well, participating in normal activities, and tolerating a normal diet. Ex. 3 at 395.

- On October 29, 2018, Petitioner presented to primary care because "her arms are still bothering her from when she got her shots on 9/20/2018. Her left is the one that really hurts." Ex. 3 at 529. Petitioner reported that arm pain increased since going back to work following her splenectomy and pain worsened with movement. Upon examination, PA-C Walker noted "pain with infraspinatus testing, hawkin's" and recommended stretching exercises and physical therapy. *Id.* at 531.

- On October 30, 2018, Petitioner followed-up with Dr. Chu for her low back and sacroiliac joint pain. Petitioner reported that her pain had resolved since the last injection, and physical therapy for her back was advised. Ex. 3 at 540-42.

- On November 6, 2018, Petitioner obtained a physical therapy evaluation for her shoulder pain. Ex. 3 at 550. Petitioner reported left shoulder pain irritated by overhead motions and increased pain at night, particularly with increased use during the day. *Id.* at 551. Petitioner describer her pain as "intermittent sharp pain and dull ache." She rated her current pain at 1/10 and her worse pain in the past few weeks at 4/10. *Id.* Petitioner advised that her job as a dog groomer required grooming, lifting, and cashiering. *Id.* at 552. The physical therapist, Erin Dressander, PT, noted left shoulder impingement, left shoulder decreased range of motion and strength, and left shoulder pain following examination. Petitioner's range of motion for flexion and extension was 125. *Id.* at 554. Petitioner reported moderate difficulty with reactional activities and household chores, moderate interference with normal activities with family and friends, moderate shoulder pain, and moderate-to-severe difficulty sleeping because of her shoulder pain. *Id.* at 562.

- Petitioner attended physical therapy for her shoulder pain with PT Dressander on November 13, 2018, and November 20, 2018. Ex. 3 at 575 – 92.

- On December 4, 2018, Petitioner presented for physical therapy and re-assessment. She reported "no longer experiencing the sharp pain in the shoulder" but still experiencing "pain with reaching overhead." Ex. 3 at 594. Petitioner reported 2-5/10 pain in the previous weeks. *Id.* at 595. PT Dressander noted left shoulder range of motion for flexion and extension to be 158-60, tenderness and hypertonicity in the left shoulder and left biceps tendon, and less than 20% impairment with limitations in carrying, moving, and handling objects. Good improvement was noted. *Id.* 596. Petitioner reported mild difficulty with recreational activities, moderate interference with normal activities with family and friends, mild shoulder pain, and mild difficulty sleeping because of her shoulder pain. Ex. 3 at 603.

- On December 12, 2018, Petitioner attended physical therapy. Petitioner reported a pain level of 1-2/10 was assessed with a near full range of motion—"AROM post-tx: L abduction 172, flexion 174." Ex. 3 at 608-609.

- On December 18, 2018, Petitioner attended her sixth physical therapy session. She reported her shoulder being 98% better, no more night or morning pain, being able to lift without pain, and rated her pain 0/10. Ex. 3 at 623. Petitioner reported no difficulty, interference, or limitations in recreational activities, daily activities, or sleeping. *Id.* at 630. She also reported no difficulty doing any of her work using her usual techniques and no difficulty doing her work as well as she would like. *Id.* at 631. It was anticipated that Petitioner would be discharged from physical therapy in two weeks. *Id.* at 624.

- On December 26, 2018, Petitioner presented to urgent care for flu symptoms. Ex. 3 at 650. No shoulder issues were reported - "moves all extremities well" was documented. *Id.* at 652.

- Petitioner did not attend her physical therapy appointment on December 31, 2018, which was scheduled for her discharge from physical therapy. Ex. 3 at 624. Petitioner had not previously missed any physical therapy appointments. *See id.* at 613.

- On February 7, 2019, Petitioner presented to her pain clinic for a follow-up for her low-back and sacroiliac joint pain. Ex. 3 at 635. Another sacroiliac

6

- joint injection was completed on February 20, 2019, and physical therapy was recommended. *Id.* at 639; Ex. 7 at 13.

- Petitioner obtained counsel prior to six-months post-vaccination.[4] Petitioner's counsel began requesting medical records by February 22, 2019. *See* Ex. 4.

- On March 26, 2019, Petitioner presented PA-C Walker for shoulder pain. "She finished therapy and it is now progressively starting to come back with constant pain." Ex. 8 at 12. PA-C Walker noted that Petitioner "does a lot of lifting at feed store" and that "shoulder pain is now bothering her with lifting bags at the store." *Id.* at 13. She discussed with Petitioner that "with job of repetitive heavy lifting, pain may be overuse related." *Id.* at 15. Petitioner was advised to return to physical therapy and x-rays were ordered. *Id.* at 16. Petitioner underwent x-ray imaging for her left shoulder pain the same day. Ex. 5 at 11. In her intake questionnaire, Petitioner reported "left shoulder pain since 9-21-18…lateral shoulder area pain – did PT for 6 weeks, was better, but now pain has returned just as bad." *Id.* at 17. Petitioner's x-rays were normal. *Id.* at 43.

- Petitioner returned to the pain clinic for her low back and sacroiliac joint pain on April 9, 2019. Ex. 7 at 6. Petitioner reported mild pain causing "mild difficulties with activities of daily living such as sitting, standing, walking, lifting, bending, twisting self-care, sleeping, and recreational activities." *Id.* Petitioner received trigger point injections for her pain. *Id.* at 10.

- On April 23, 2019, Petitioner returned to PT Dressander for physical therapy evaluation of left shoulder pain. Ex. 5 at 43. Petitioner reported, "since February I stated to notice that it is getting bad…it was kinda (sic) there after we were done [in December of 2018] and I thought it would just work its way out but it just kept progressing." *Id.* Petitioner range of motion for flexion to extension was 168 and 160 for abduction. *Id.* at 45. Petitioner rated her pain that day as 0/10, her worst pain in the past few weeks as 1-2/10, and that the pain was "not severe but irritating." *Id.* at 44. Petitioner reported no difficulty with recreational or social activities with friends and family, mild shoulder pain, and no difficulty sleeping. *Id.* at 45. Petitioner's symptoms were consistent with left shoulder pain, left shoulder impingement, and parascapular weakness. *Id.*

---

[4] Petitioner was vaccinated on September 20, 2018. Six-months post-vaccination would be March 20, 2019.

- Petitioner returned to Dr. Chu for her low back pain on May 2, 2019. Ex. 7 at 13. She rated her pain as 1/10, reported limitation of motion, back pain and stiffness, and was advised to start physical therapy. *Id.* at 13, 16.

- Petitioner attended physical therapy for her shoulder on May 7, 2019. Ex. 5 at 63. Petitioner reported not doing her exercises because her shoulder had not been as sore. *Id.*

- Petitioner presented to PT Dressander for physical therapy evaluation of her low back pain on May 14, 2019. Ex. 5 at 87. Petitioner rated her pain as 1-2/10 and her worst pain in the past few weeks at 3-4/10. *Id.* at 88. Petitioner's pain was aggravated by rising from a seated position and sleeping was painful. *Id.* Petitioner was assessed with low back pain, left pelvis obliquity, decreased hip flexibility, and gluteal and core weakness. *Id.* at 90. Petitioner reported that lifting heavy objects caused her additional back pain, pain prevented her from sitting for more than one hour, pain caused her to sleep less than six hours, and "normal job/homemaking activities increased [her] pain." *Id.* at 91.

- On May 21, 2019, Petitioner attended physical therapy for her shoulder and rated her pain as 0/10 and her worst pain in the past few weeks as 1-2/10. Ex. 5 at 97. She reported no difficulty with recreational or social activities with friends and family, mild shoulder pain, and no difficulty sleeping. *Id.* at 106. She also reported no difficulty doing any of her work using her usual techniques and no difficulty doing her work as well as she would like. *Id.* at 107.

- Petitioner returned to physical therapy for her back pain on May 28, 2019. Ex. 5 at 111. She reported using a cane to walk, which "really helped." *Id.* She rated her back pain as 1/10. *Id.*

- Petitioner retuned to physical therapy for her back pain on June 4, 2019. Ex. 5 at 129. Petitioner reported that her back was sore from heavy lifting and moving at work. *Id.* She rated her pain as 0.5/10 and her worst pain in the past few weeks at 4/10. *Id.* Petitioner reported that lifting heavy objects caused her additional back pain, pain caused her to sleep less than six hours, and "normal job/homemaking activities increased [her] pain." *Id.* at 141. Petitioner also received a trigger point injection for her back pain on June 4, 2019. Ex. 7 at 21.

8

- On June 18, 2019, Petitioner discharged from physical therapy for her left shoulder. Ex. 5 at 146. She reported pain only irritated by touch and that she no longer had pain overhead. *Id.* She rated her pain as 0/10 and her worst pain in the past few weeks as 0/10 – though 1/10 when irritated by touch. *Id.* at 146. She reported no difficulty or interference with any tasks, sleeping, or work and no shoulder pain. *Id.* at 154-55.

- Petitioner attended physical therapy for her back pain on June 25, 2019. Ex. 5 at 159. Petitioner reported having a back spasm while grooming a dog. *Id.* She rated her back pain as 2/10. *Id.*

- Petitioner received a sacroiliac joint injection on July 1, 2019. Ex. 7 at 11. She returned to physical therapy for her back pain on July 9, 2019, and reported that the injection helped her sleep better. Ex. 5 at 169. She rated her pain as 1/10, her worst pain in the past few weeks as 3/10. *Id.* Petitioner reported being able to lift heavy objects without extra pain, that her sleep was occasionally disturbed by the pain, and "normal job/homemaking activities increased [her] pain." *Id.* at 184.

- Petitioner was discharged from physical therapy for her back on July 30, 2019. Ex. 5 at 205. She rated her pain as 0-1/10. *Id.*

In addition to her records, Petitioner filed six affidavits in support of her claim: two personal affidavits, the affidavit of Petitioner's manager – Jennifer Fuss, the affidavit of a coworker – Sophie Fuss, the affidavit of Petitioner's husband – Randy McCallum, and the affidavit of Petitioner's sister-in-law – Cindy Denver. Ex. 1; Ex. 10; Ex. 11; Ex. 12; Ex. 13; Ex. 14. Petitioner affirmed that she had shoulder pain since her vaccinations on September 26, 2018, and began physical therapy for her shoulder on November 6, 2018. Ex. 1 ¶¶ 9, 14. She was discharged on December 18, 2018, but she "still did not have full range of motion." *Id.* ¶15. When she returned to her primary care office on March 26, 2019, "I explained that I had improved from physical therapy but that my pain had returned since being discharged." *Id.* ¶ 16. In her supplemental affidavit, Petitioner affirmed she had "about 85% of her range of motion" when she was discharged in December 2018. Ex. 10 ¶ 6. However, "I was unable to maintain my gains once I was discharged…My decreasing range of motion and increasing pain started to gradually return over the next several months." *Id.* ¶13. Petitioner attended physical therapy between April 23, 2019, and June 18, 2019, because she continued to have pain. Ex. 1 ¶ 17.

Petitioner's manager, Jennifer Fuss, loosely corroborated Petitioner's recollection of events but did not provide details. *See* Ex. 11. Though Ms. Fuss stated that she "lost dog business at the store because Amy could not handle larger dogs to groom" and that

9

"Amy was not able to lift her arm upwards for quite some time," Ms. Fuss did not provide dates, details, or any timeline as to when these issues occurred. *Id.* ¶¶ 12-13. Ms. Fuss also affirmed that Petitioner "still needs help lifting larger dogs during grooming." *Id.* ¶ 14. Sophie Fuss, a co-worker, submitted a similar affidavit that roughly affirmed Petitioner needing assistance at work but provided no details. *See* Ex. 12. She stated, "Amy was not able to groom bigger dogs because she could not transport the dogs…I also helped Amy carry heavy feed bags to different locations around the store." *Id.* ¶¶ 11-12. She did not provide when, for how long, or how often she needed to assist Petitioner. Neither Jennifer nor Sophie Fuss mentioned Petitioner's back pain.

Petitioner's sister-in-law, Cindy Denver, was living with Petitioner and Petitioner's husband during the relevant period. Ex. 14 ¶ 5. Ms. Denver affirmed that she saw Petitioner do exercises and stretches for her shoulder at home. *Id.* at ¶ 13. She testified that she was "not aware of Amy reinjuring her shoulder." *Id.* ¶14. As with the affidavits from Jennifer and Sophie Fuss, Ms. Denver did not provide details, dates, or any timeline regarding Petitioner's injury.

Petitioner's husband, Randy McCallum, affirmed that Petitioner "never fully recovered from her shoulder injury…she still cannot lift her left arm very high because of her pain." Ex. 13 ¶ 11. After Petitioner's first round of physical therapy, "Amy's shoulder started bothering her more during this time and she told me it was getting worse. Amy asked me if I would rub her back and shoulder more often during that time." *Id.* ¶¶ 9-10. Mr. McCallum provided no dates or specific events for his recollections. He did not mention Petitioner's difficulty sleeping, lifting, or sitting due to her back and sacroiliac joint pain.

Respondent disputes whether Petitioner's left shoulder pain after December 2018 is a result of Petitioner's alleged SIRVA. *See* ECF No. 29. at 9. Respondent specifically cites Petitioner's near complete recovery by the end of 2018, and the medical suggestion that Petitioner's pain in March 2019 was overuse-related. *Id.* at 9-10. Certainly, there is a substantial (three month) treatment gap in this case, which reasonably allows for the possibility that *other* intervening issues or factors caused the later symptoms and reports of left shoulder pain.

In addition, the affidavits provided in this matter provide little support for the contention that Petitioner's pain lingered between December 18, 2018, and March 26, 2019 (though they do support Petitioner's SIRVA injury overall). While Jennifer and Sophie Foss affirmed that Petitioner required assistance at work and could not lift heavy feed or large dogs for some time, they provided no timeline, dates, or details. These general affirmations are insufficient to supplant the three-month treatment gap. Furthermore, the medical records between February and July 2019 indicate that

10

Petitioner's back pain was significantly affecting her ability to work, sleep, and complete normal daily activities (including a back spasm while grooming a dog). Ex. 7 at 6, 13; Ex. 5 at 91, 141, 159, 169, 184. Contemporaneously, Petitioner reported that her left shoulder caused little to no difficulties with work, sleep, or normal daily activities (including a report on May 7, 2019, that she did not do her exercises because her shoulder had not been as sore). Ex. 5 at 54, 63, 106-07, 154-55. Vague testimony noting Petitioner's need for assistance at work and inability to lift feed or heavy dogs is not indicative of shoulder pain in the relevant timeframe. Ms. Denver's affidavit is similarly ineffectual, and Mr. McCallum's affidavit contradicts the medical records as Petitioner has reported being able to lift her arm without pain and having full range of motion. Ex. 3 at 630-31; Ex. 5 at 106-07, 146, 154-55.

At the same time, however, Petitioner's own statements and objective treatment records support the conclusion that Petitioner had some residual limitations that may have lingered past December 2018, and even progressed in the following months. While she reported no difficulties working, sleeping, or going about daily activities at the end of her first round of physical therapy, Petitioner did not report that she felt 100% recovered. Ex. 3 at 623. Petitioner then reported on March 26, 2019, that her pain since vaccination had been better following physical therapy, but had now "returned just as bad." Ex. 5 at 17. At her subsequent physical therapy evaluation, Petitioner reported that "it was kinda (sic) there after we were done [in December 2018] and I thought it would just work its way out but it just kept progressing." Ex. 5 at 43.

In addition, the record reveals that Petitioner's range of motion also decreased between December 2018 and April 2019. When Petitioner was discharged from physical therapy in December 2018, Petitioner's range of motion for abduction was 172, and range of motion for flexion and extension was 174. Ex. 3 at 608-609. However, at her evaluation for left shoulder pain on April 23, 2019, Petitioner's range of motion for abduction was 160 and range of motion for flexion and extension was 168. Ex. 5 at 45.

Respondent has persuasively noted that some (if not much) of Petitioner's pain in early 2019 may have been associated with workplace activities. But this does not negate the underlying SIRVA; rather, it only establishes that Petitioner had comorbidities, preventing the conclusion that *all* of her contemporaneous pain is SIRVA-associated. Petitioner herself acknowledges that "I was unable to maintain my gains once I was discharged…My decreasing range of motion and increasing pain started to gradually return over the next several months." Ex. 10 ¶13. Otherwise, the treatment records from the period close-in-time to vaccination support the conclusion that Petitioner *did* experience a SIRVA injury consistent with all aspects of the Table requirements (which Respondent acknowledged in his Rule 4(c) Report).

Thus, while the record establishes that Petitioner's SIRVA-associated symptoms were diminishing in severity during the winter of 2019, Petitioner has made a preponderant showing – *though just barely* – that she experienced residual symptoms of left shoulder pain for six months post-vaccination, sufficient to meet the severity requirement. Of course, the fact dispute that I have resolved in Petitioner's favor also counsels against a significant pain and suffering award in this case. The evidence establishes a fairly mild SIRVA that (according to the physical therapy records) in April through June was only rated 1-2/10 at worst and did not interfere in any significant way with her work or recreational activities. In addition, this case did not involve surgery – meaning that a six-figure award, or anything close to that, would not be appropriate. Petitioner is counseled to fashion any pain and suffering demand to be *extremely* modest.

### C. Other Requirements for Entitlement

In light of the lack of additional objections and my own review of the record, I find that Petitioner has established all the requirements for a Table SIRVA claim. Specifically, the record does not reflect a history of prior left shoulder pathology that would explain Petitioner's post-vaccination injury. 42 C.F.R. § 100.3(c)(3)(10)(i). There is no evidence of any other condition or abnormality that represents an alternative cause. 42 C.F.R. § 100.3(c)(3)(10)(iii). The shoulder pain began within forty-eight (48) hours after vaccination. 42 C.F.R. §§ 100.3(a), (c)(3)(10)(ii). The pain and reduced range of motion were limited to the vaccinated shoulder. C.F.R. § 100.3(c)(3)(10)(iv). The contemporaneous vaccine administration record reflects the site of administration as the left deltoid. Sections 11(c)(1)(A) and (B)(i). Petitioner has not pursued a civil action or other compensation. Ex. Section 11(c)(1)(E). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA claim. Petitioner is entitled to compensation. **Thus, this case is now in the damages phase and a damages order will be issued shortly.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master